# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court."
Although it is posted on the internet, this opinion is binding only on the
parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1858-17T1

STATE IN THE INTEREST OF A.F.

_____

Submitted March 19, 2018 — Decided June 8, 2018

Before Judges Messano and Vernoia.

On appeal from Superior Court of New Jersey,
Chancery Division, Family Part, Mercer County,
Docket No. FJ-11-0116-18.

Angelo J. Onofri, Mercer County Prosecutor,
attorney for appellant  State of New Jersey
(Daniel Opatut, Assistant Prosecutor, of
counsel and on the brief).

Davis Law Firm, LLC, attorney for respondent
A.F. (Mark G. Davis, on the brief).

PER CURIAM

We granted the State's motion for leave to appeal from an order suppressing statements made by fourteen-year-old A.F. during a police interrogation conducted in the presence of his step-mother, R.F.[1] Because we are satisfied the court's findings of fact are supported by substantial credible evidence in the record,

---

[1] We employ initials to identify the juvenile and his step-mother to protect the juvenile's privacy.

and discern no basis to conclude the court erred in finding the State did not prove beyond a reasonable doubt A.F. knowingly, voluntarily and intelligently waived his <u>Miranda</u>[2] rights, we affirm.

## I.

On August 8, 2017, A.F. was interrogated by Trenton Police Department Detective Tamika Sommers and Detective Anthony Petracca.[3] The following day, A.F. was charged with delinquency for conduct that would constitute a second-degree sexual assault, N.J.S.A. 2C:14-2(b), and third-degree endangering the welfare of a child by sexual contact, N.J.S.A. 2C:24-4(a)(1), if committed by an adult. The complaint alleged A.F. sexually assaulted the victim, a five-year-old female, on or about July 12, 2017, at her Trenton home.

A.F. moved to suppress the statements made during the interrogation. The court held an evidentiary hearing at which the State presented Detective Sommers as a witness. The court also reviewed a video and audio recording of the interrogation that was admitted in evidence.

---

[2] <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966).

[3] Detective Sommers testified Detective Petracca was "from the county," but did not identify the law enforcement agency by which he was employed.

The court rendered an oral opinion and made detailed findings of fact. The court found R.F. is married to A.F.'s biological father. A.F. resided with his father and R.F. for two to three years prior to the alleged July 12, 2017 incident. The court found A.F. "looked to" R.F. "as his mother or stepmother and that was apparent during the" interrogation.

The court further found R.F. had close to a familial relationship with the mother and grandmother of the alleged five-year-old victim. R.F. and the victim's mother had been good friends when they lived in West Africa, and their relationship continued following their respective moves to New Jersey. The victim's mother considered R.F. a sister.[4] The court determined

---

[4] The mother of the alleged five-year-old victim did not testify at the suppression hearing. The evidence concerning the relationship between R.F., the victim, and the victim's family was provided by Detective Sommers who recounted the victim's mother's statements describing R.F.'s relationship with her, her daughter, and her family. The "rules of evidence" applied during the suppression hearing, N.J.R.E. 104(c), but the State did not object to Detective Sommers's testimony concerning the victim's mother's statements. The motion court implicitly found the victim's mother's statements credible because the court based many of its factual findings on what Detective Sommers testified the victim's mother said. On appeal, the State does not challenge the admissibility of Detective Sommers's testimony or the court's reliance on it. An issue not briefed on appeal is deemed waived. Jefferson Loan Co. v. Session, 397 N.J. Super. 520, 525 n.4 (App. Div. 2008); Zavodnick v. Leven, 340 N.J. Super. 94, 103 (App. Div. 2001). Moreover, we would not consider any challenge to the admissibility of the testimony because an objection to the testimony was not "properly presented to the trial court" and the admissibility of the testimony does not "go to the jurisdiction

that although R.F. and the victim's mother were not blood relatives, based on their close relationship R.F. could be viewed as the victim's aunt.

The court found Detective Sommers was a credible witness who described her efforts to contact A.F.'s family to arrange the interrogation. She contacted A.F.'s father, but he was out-of-state. A.F.'s father told Detective Sommers to contact R.F. to arrange A.F.'s interrogation at which R.F. would be present.

The court further found A.F.'s father gave Detective Sommers contact information for A.F.'s maternal grandfather with whom A.F. began living following the victim's report of the alleged July 12, 2017 assault. The court found A.F. began residing with his grandfather because A.F. could not return to R.F.'s home where R.F. and A.F.'s father's two young children also resided.

R.F. scheduled the interrogation with Detective Sommers for 5:30 p.m. on August 8, 2017. Arrangements were made for A.F.'s grandfather to transport A.F. to the interrogation.

R.F. arrived for the interrogation at the scheduled time. A.F.'s father contacted Detective Sommers and said A.F. would be

---

of the trial court or concern matters of great public interest." State v. Robinson, 200 N.J. 1, 20 (2009) (quoting Nieder v. Royal Indem. Ins. Co., 62 N.J. 229, 234 (1973)).

late because A.F.'s grandfather was in traffic. Prior to A.F.'s arrival, R.F. reviewed and signed a form consenting to an interview regarding "an alleged sexual assault that occurred at" the five-year-old victim's home on July 12, 2017. The consent form included a statement that R.F. "realize[d]" A.F. could "stop answering questions at any time" and that she "advised [A.F.] of this fact."

The court determined that upon A.F.'s arrival, there was no consultation between A.F. and R.F. "to go over consent or to go over what the interest of the juvenile was or what he wanted to do." Instead, A.F., R.F., Detective Sommers and Detective Petracca immediately entered the interrogation room. The court found Detective Sommers read A.F. his Miranda rights, and A.F. provided one-word answers indicating he understood each of his rights.

The court found there was no interaction between A.F. and R.F. during Detective Sommers's administration of the Miranda warnings. Detective Sommers did not ask any follow-up questions to assess whether A.F. actually understood his rights or wanted to consult with R.F. concerning them.

The court also found the interview was A.F.'s first involvement with the juvenile justice system, and there was no evidence A.F. otherwise had familiarity with the proceedings. The State did not present any evidence concerning A.F.'s level of intelligence or education. The court found that following the

administration of his <u>Miranda</u> rights, A.F. was questioned by the officers concerning the alleged assault of the five-year-old victim.

The court found "troubling" that the interview was conducted without A.F. having had the opportunity to consult with R.F. about his rights and whether R.F. would act in his best interest. The court also determined the interview went beyond the scope of R.F.'s written consent because the questioning was not limited to the alleged assault of the five-year-old victim as indicated on the consent form R.F. signed.

The detectives also questioned A.F. about whether he had sexually assaulted his younger half-sister,[5] who is the biological daughter of A.F.'s father and R.F. The court found that prior to the interrogation, A.F's father and R.F. told Detective Sommers A.F. may have inappropriately touched their daughter. The court further found that although the consent form was limited to the alleged July 12, 2017 incident involving the five-year-old girl, when the detective questioned A.F. about whether he assaulted his half-sister, R.F. did not act to end the questioning, direct A.F.

---

[5] The motion court and A.F. refer to the sister as a step-sister. We refer to her as A.F.'s half-sister because we understand that she and A.F. share the same father.

not to answer, or otherwise act as a buffer between A.F. and the detectives.

The court concluded R.F. had a clear conflict of interest in her role as A.F.'s parent during the interview because she was like an aunt to the alleged five-year-old victim, and she was the biological mother of A.F.'s half-sister. The court found Detective Sommers was aware R.F. had a conflict because the detective knew about R.F.'s close relationship with the alleged five-year-old victim and, prior to the interrogation, R.F. and A.F.'s father reported A.F. may have assaulted their biological daughter. The court found no action was taken to address the conflict or ensure A.F. received the support and counsel of an independent adult.

The court determined that because R.F. and A.F.'s father advised Detective Sommers they were concerned A.F. may have assaulted their daughter, neither R.F. nor A.F.'s father was completely independent and disassociated from the prosecution. The court found that because R.F. had a conflict, she was not suitable to consent to the interview or act as an independent adult under the circumstances presented. The court also found A.F.'s maternal grandfather was immediately available to act as an independent adult on A.F.'s behalf, and he did not have the conflicts of R.F. and A.F.'s father.

The court concluded that based on the totality of the circumstances presented, the State failed to prove beyond a reasonable doubt A.F. made a knowing, voluntary, and intelligent waiver of his rights. The court entered an order granting defendant's suppression motion, and we granted the State's motion for leave to appeal.

The State presents the following arguments[6] for our consideration:

> POINT I
>
> THE TRIAL COURT ERRONEOUSLY SUPPRESSED THE JUVENILE'S STATEMENT TO POLICE.
>
> A. Lack of Consultation.
>
> B. Conflict of Interest.
>
> C. Scope of Consent.
>
> D. Intelligence of the Juvenile.

## II.

We conduct a limited review of a motion court's factual findings supporting a decision granting a motion to suppress statements given during a police interrogation. State v. S.S.,

---

[6] In Point I of its brief, the State argues we should grant its motion for leave to appeal. We granted the motion and therefore it is unnecessary to address the arguments concerning the request for leave to appeal. We address only the arguments supporting the State's claim the court erred by granting A.F.'s suppression motion.

229 N.J. 360, 374 (2017). We determine whether the court's factual findings "are supported by sufficient credible evidence in the record." Ibid. (quoting State v. Gamble, 218 N.J. 412, 424 (2014)). We recognize a motion judge has the opportunity to hear live testimony, observe demeanor, and acquire a "'feel' of the case, which a reviewing court cannot enjoy." Ibid. (quoting State v. Elders, 192 N.J. 224, 244 (2007)).

The same deferential standard is applied to factual findings made by the motion court based on its review of video recordings of a juvenile defendant's interrogation, because this approach "best advances the interests of justice in a judicial system that assigns different roles to trial courts and appellate courts." Id. at 379. We owe no deference to the court's legal conclusions "[b]ecause legal issues do not implicate the fact-finding expertise of the trial courts." Id. at 380. We "construe the Constitution, statutes, and common law 'de novo - with fresh eyes - owing no deference to the interpretive conclusions' of trial courts . . . ." Ibid. (quoting State v. Morrison, 227 N.J. 295, 308 (2016)).

"[F]or a juvenile's confession to be admissible into evidence it must satisfy the same standard that applies to adult confessions . . . ." State ex. rel. A.S., 203 N.J. 131, 146 (2010). "All rights guaranteed to criminal defendants by the Constitution of

the United States and the Constitution of this State . . . shall be applicable to cases arising under the [New Jersey Code of Juvenile Justice]." N.J.S.A. 2A:4A-40. Juveniles enjoy the privilege against self-incrimination during a custodial interrogation that is guaranteed by the Fifth Amendment to the United States Constitution, and as "'is firmly established as part of the common law of New Jersey and . . . our Rules of Evidence.'" State v. Presha, 163 N.J. 304, 312-13 (2000) (quoting State v. Hartley, 103 N.J. 252, 260 (1986)).

A juvenile may waive the privilege against self-incrimination but, "for a confession to be admissible as evidence, [the State] must prove beyond a reasonable doubt that the [juvenile's] waiver was knowing, intelligent, and voluntary in light of all the circumstances." Id. at 313. The primary inquiry is whether the suspect's will was overborne by police conduct. Ibid.

In Presha, the Court explained that to determine if a juvenile's confession was the "product of free will" and therefore admissible as evidence, courts must consider the totality of the circumstances "surrounding the arrest and interrogation, including such factors as 'the suspect's age, education and intelligence, advice as to constitutional rights, length of detention, whether the questioning was repeated and prolonged in nature and whether physical punishment or mental exhaustion was involved,'" ibid.

10

(quoting State v. Miller, 76 N.J. 392, 402 (1978)), and the juvenile's previous encounters with law enforcement, ibid.

The Court also instructed that the juvenile justice system's increased emphasis on punishment over rehabilitation placed a "new significance" on a parent's role in a juvenile's interrogation. Id. at 315. "The role of the parent in the context of juvenile interrogation takes on special significance" because "the parent serves as an advisor to the juvenile, someone who can offer a measure of support in the unfamiliar setting of the police station." Id. at 314. A parent's role is to "serve[] as a buffer between the juvenile, who is entitled to certain protections, and the police, whose investigative function brings the officers necessarily in conflict with the juvenile's legal interests." Id. at 315.

In A.S., the Court again addressed the role of a parent during a juvenile's interrogation, explaining that "the mere presence of a parent is insufficient to protect a juvenile's rights, because presence alone cannot be said to provide the buffer between the police and the juvenile" contemplated in Presha. 203 N.J. at 148. To fulfill the role of the buffer contemplated by the Court's decision in Presha, "the parent must be acting with the interests of the juvenile in mind." Ibid. The Court determined the parent did not fulfill that role where she effectively functioned as an

A-1858-17T1

agent of the police and the juvenile was provided incorrect and conflicting information about her constitutional rights. Id. at 151–52.

Applying these principles, we consider the State's argument the court erred by finding it failed to prove beyond a reasonable doubt A.F. waived his right against self-incrimination knowingly, intelligently and voluntarily. The State contends the court incorrectly relied on its findings that: (a) A.F. was not afforded an opportunity to consult with R.F.; (b) the questioning exceeded the scope of R.F.'s consent; (c) R.F. had a conflict of interest based on her close relationship with the five-year-old victim and because she was the biological mother of A.F.'s half-sister about whom he was questioned; and (d) the lack of evidence establishing A.F.'s level of intelligence. The State does not demonstrate the court's fact-findings lack support in the substantial credible record evidence.[7] Instead, the State argues a reversal is required because the court did not correctly apply the facts under the applicable legal standards. We disagree.

---

[7] The State asserts in conclusory fashion that the court's fact-findings are not supported by sufficient credible evidence in the record. However, it does not cite to any particular findings of fact that lack evidentiary support, and our review of the record shows the court's findings are adequately supported.

12

In its brief, the State segregates the factors the court considered in making its determination, and argues each could not properly support the court's conclusion the State failed to meet its burden. The State ignores that the court's determination whether the State proved beyond a reasonable doubt that A.F. knowingly, intelligently and voluntarily waived his right against self-incrimination requires an assessment of the totality of the circumstances. See Presha, 163 N.J. at 313; see also State ex rel. A.W., 212 N.J. 114, 137-38 (2012) ("[u]sing a totality of the circumstances approach" in determining the admissibility of a juvenile's statements made during a police interrogation). The record shows that is precisely what the motion court did here.

The court properly considered the State's failure to present direct evidence concerning A.F.'s intelligence and education because a juvenile's intelligence and education is a relevant factor in determining whether there was a knowing, intelligent and voluntary waiver of the right against self-incrimination. See Presha, 163 N.J. at 313. The State argues A.F.'s statements and actions during the interrogation demonstrated A.F. possessed the intelligence and education required to knowingly, intelligently and voluntarily waive his rights. However, we defer to the court's implicit rejection of that evidence based on its review of the recording of the interrogation, see S.S., 229 N.J. at 379, and the

court's determination the State's failure to present direct evidence left a void in the State's proofs as to the admissibility of A.F.'s statements, see State v. Locurto, 157 N.J. 463, 474 (1999) (finding on appeal we do not second guess a court's determination finding a lack of evidence persuasive).

A.F. was fourteen years old when he was interrogated. A fourteen-year-old child "is still of tender sensibilities and may have great difficulty withstanding the rigors of a police interrogation." A.S., 203 N.J. at 149. We therefore find no error in the court's reliance on the lack of evidence directly showing A.F.'s level of education and education as a significant factor, among the totality of circumstances, supporting its conclusion the State failed to satisfy its burden.

The State also claims the court erred by finding A.F. did not have a "realistic opportunity" to consult with R.F. about the interrogation, his rights and R.F.'s role during the interrogation, and by relying on the lack of such an opportunity as a factor supporting its determination the State failed to satisfy its burden. The State contends there is no common law or statutory requirement that a juvenile be provided an opportunity for consultation with a parent prior to an interrogation, and the motion court erred by interpreting the Court's citation in Presha, 163 N.J. at 314, to Garrett v. State, 351 N.E.2d 30 (1976), as

requiring such a consultation.  The State also asserts that, in any event, a consultation was not required because A.F. was advised of his Miranda rights in R.F.'s presence, and said he understood and agreed to waive those rights.

In Garrett, the Supreme Court of Indiana explained that its standard for the admissibility of a juvenile's statements during a police interrogation requires that "the child . . . be given an opportunity to consult with his parents, guardian or an attorney . . . as to whether or not he wishes to waive" his Miranda rights. 351 N.E.2d at 33 (quoting Lewis v. State, 288 N.E.2d 138, 142 (1972)).  In Presha, the Court cited Garrett in its discussion of a parent or guardian's role in the interrogation of a juvenile. 163 N.J. at 314.

Here, the motion court did not determine that the absence of an opportunity for R.F. to consult with A.F. required suppression of his statements.  The court instead relied on the absence of that opportunity as one of the many circumstances it considered in assessing whether R.F filled her role to "act [] with the interests of [A.F.] in mind,"  A.S., 203 N.J. at 148, and A.F. knowingly, intelligently and voluntarily waived his rights.

In Presha, the Court did not hold that consultation between a parent or guardian and a juvenile is a prerequisite to a finding a juvenile knowingly, intelligently and voluntarily waived Miranda

rights during, and we agree the Court's citation to <u>Garrett</u> does not constitute an adoption of the Indiana standard. <u>See</u> <u>In re Pelvic Mesh/Gynecare Lit.</u>, 426 N.J. Super. 167, 186 (App. Div. 2012) (finding that if the Court intended to adopt a new rule of law it would do so directly). However, we find no error in the motion court's reliance on the absence of an opportunity for a consultation as one of the many circumstances it considered in determining if R.F. "acted[ed] with [A.F.'s] interests . . . in mind," <u>A.S.</u>, 203 N.J. at 148, and whether A.F. knowingly, intelligently and voluntarily waived his <u>Miranda</u> rights, <u>see</u> <u>A.S.</u>, 203 N.J. at 155 n.6 (quoting <u>State v. Mears</u>, 170 Vt. 336, 749 A.2d 600, 604 (2000)) ("not[ing] the practical approach" taken by the Supreme Court of Vermont requiring that a juvenile "be given the opportunity to consult with an adult" as one criteria in determining whether a juvenile's statement was given knowingly, intelligently and voluntarily).

The court was required to assess the totality of the circumstances "surrounding the . . . interrogation," <u>Presha</u>, 163 N.J. at 313, including the "highly significant factor" of R.F.'s role in A.F.'s waiver of his <u>Miranda</u> rights, <u>id.</u> at 315. A.F. had been living with his grandfather, arrived late to the interrogation, and did not have an opportunity to consult with R.F. following her execution of the consent form and prior to the

interrogation. R.F.'s mere presence at the interrogation is not dispositive of whether she filled the significant role of serving as a buffer between A.F. and the police during the interrogation. A.S., 203 N.J. at 148. We therefore discern no error in the court's reliance upon the lack of an opportunity for consultation, and the concomitant lack of a consultation itself, between A.F. and R.F. as a factor in its assessment of whether R.F. filled her parental role and if A.F. knowingly, intelligently and voluntarily waived his Miranda rights.

For the same reason, we reject the State's contention the court erred by relying on what it determined were R.F.'s conflicts of interest. The court considered R.F.'s close relationship with the alleged five-year-old victim, and R.F. and A.F.'s father's report they suspected A.F. may have assaulted their young daughter as circumstances showing R.F. could not properly fill the significant role required to insure A.F. knowingly, intelligently and voluntarily waived his Miranda rights.

In A.S. the juvenile's adoptive mother, who was present on the juvenile's behalf during an interrogation, was also the grandmother of the alleged victim. Id. at 137. In reaffirming that "the presence of a parent is a 'highly significant factor' in the totality of the circumstances analysis contemplated in Presha," the Court expressed "concerns" about the mother's

17

conflict of interest because she was also the grandmother of the alleged victim. Id. at 154 (emphasis in original). Although the Court rejected "a categorical rule that an attorney must be present any time there is a perceived clash in the interests of the parent based on a familial relationship with the victim," and recognized that "[e]ven in cases of such apparent clashing interests, a parent may be able to fulfill the role envisioned in Presha[,]" the Court cautioned that where the interrogating officers are aware of "competing and clashing interests," they should "strongly consider ceasing the interview when another adult, who is without a conflict of interest, can be made available to the child."[8] Id. at 154-55. The Court recognized that a conflict of interest may interfere with a parent's fulfillment of the role as a buffer between a juvenile and the police. Id. at 154.

Here, the motion judge determined R.F. "clearly" had a conflict that did not allow a finding she acted with A.F.'s best interests in mind. See id. at 154-55. R.F. was like an aunt to the alleged five-year-old victim and, prior to the interrogation, she and A.F.'s father reported to the police they suspected A.F. may have assaulted their daughter. They then arranged for A.F.'s

---

[8] The Court also warned that where a parent has conflicting interests, the police should also not permit the parent to "assume the role of interrogator" during the interrogation. Id. at 155. R.F. did not assume such a role here.

interrogation with only R.F. present. The police knew R.F. had a conflict; she and A.F.'s father reported their suspicions and, as a result, the police questioned A.F. about his half-sister. Yet, there is no evidence the police considered delaying or interrupting the interrogation until an adult without a conflict, such as A.F.'s maternal grandfather, was made available. See A.S., 203 N.J. at 155.

R.F. did not directly participate in A.F.'s interrogation like the mother in A.S., but she and A.F.'s father cooperated with the police investigation by reporting their suspicions A.F. assaulted their daughter, and then arranging the interrogation during which A.F. was questioned about their suspicions. To be sure, R.F. was present during the interrogation, but that was not enough. See id. at 148. The motion court determined that R.F.'s clear conflicts of interest did not permit a determination she was acting, as required, with A.F.'s best interests in mind during the interrogation. We discern no basis to reject the court's conclusion. Thus, R.F.'s failure to fulfill her role as an independent adult with A.F.'s best interests in mind was properly given "great weight" by the motion court in its assessment of the totality of the circumstances. Presha, 163 N.J. at 315.

In sum, we are convinced the court properly considered various factors in its assessment of the totality of the circumstances

A-1858-17T1

relevant to a determination of whether the State satisfied its burden of proving beyond a reasonable doubt that A.F.'s statements were made knowingly, intelligently and voluntarily. The court's findings are supported by the evidence and we are convinced the record provides no basis to reverse the court's conclusion the State failed to meet is burden.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION