## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Dec 05 2018, 9:07 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Nancy A. McCaslin
McCaslin & McCaslin
Elkhart, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Lyubov Gore
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Z.T., <br> *Appellant-Respondent,* <br><br> v. <br><br> State of Indiana, <br> *Appellee-Petitioner* | December 5, 2018 <br><br> Court of Appeals Case No. 18A-JV-1656 <br><br> Appeal from the Elkhart Circuit Court <br><br> The Honorable Michael A. Christofeno, Judge <br> The Honorable Deborah A. Domine, Magistrate <br><br> Trial Court Cause No. 20C01-1710-JD-540 |

**Baker, Judge.**

[1] Z.T. appeals the juvenile court's dispositional order committing him to the Indiana Department of Correction (DOC), arguing that he was denied due process and that his new placement was improper. Finding no error, we affirm.

# Facts

[2] Sixteen-year-old Z.T. has a history of mental health issues and run-ins with the law.[1] On October 23, 2017, Z.T.'s father reported Z.T. as a runaway to the Elkhart County Sheriff's Department. Later, officers were dispatched to the Concord Mall in Elkhart County, where Z.T. refused to leave with them, cursed loudly, and struck one officer in the eye, shattering his eyeglasses. Police detained Z.T. and transferred him to a juvenile detention center, where he was discharged soon after.

[3] On November 1, 2017, the State filed a delinquency petition, alleging that Z.T. was delinquent for committing acts that would be Level 5 felony battery against a public safety official; Class A misdemeanor resisting law enforcement; and Class B misdemeanor disorderly conduct had they been committed by an adult. The next day, Z.T. admitted to amended Level 6 felony resisting law enforcement and disorderly conduct counts. The juvenile court adjudicated him

---

[1] In June 2015, the State alleged that Z.T. committed what would have been Class B misdemeanor criminal mischief had it been committed by an adult. In July 2017, Z.T. was adjudicated delinquent for offenses that would have been Level 6 felony battery resulting in moderate bodily injury; Class A misdemeanor battery resulting in bodily injury; Class A misdemeanor resisting law enforcement; and Class B misdemeanor battery had they been committed by an adult. Additionally, Z.T. was suspended from school for arguing with a teacher, left home without permission, and was often belligerent and harmful in his words and actions.

delinquent on those counts and dismissed the felony battery count. The juvenile court placed Z.T. in a juvenile detention center and ordered that he undergo a psychological evaluation.

[4] Dr. Rachael Garcia conducted the psychological evaluation and diagnosed Z.T. with Depressive Disorder and Oppositional Defiant Disorder. Dr. Garcia recommended to the juvenile court that Z.T. be placed in a highly structured environment due to his aggression and disregard for authority. The juvenile court committed Z.T. to the Rite of Passage (ROP) residential facility, a "military-like" institution with a variety of therapeutic programs. Tr. Vol. II p. 38.

[5] While at ROP, Z.T. showed few signs of improvement. Over the course of just six months, Z.T. often used profanity and uttered racial slurs towards his peers; argued and fought with security staff and fellow residents; destroyed property, including doors and bedframes; resisted anyone's efforts to control him; punched walls; tackled and shoved staff members; refused to participate in scheduled programs; disrupted other groups' therapy sessions; and injured himself and others.

[6] On May 14, 2018, ROP informed the juvenile probation department that it wanted to transfer Z.T. out of its facilities. ROP stated that Z.T. was making very little progress and was actively impeding other residents' progress. ROP opined that Z.T. needed a "higher level of care," *id.* at 41, in an even stricter institution.

[7] On June 4, 2018, the juvenile court conducted a modification of disposition hearing to determine Z.T.'s next placement. Z.T., his attorney, and two ROP representatives appeared at the hearing via Skype,[2] and Z.T.'s family members and probation officer appeared in person. At the hearing, the juvenile probation officer pointed out that Z.T. had had opportunities to participate in structured classes, supervised probation, community service, Lunch With A Cop, family therapy, individual therapy, the Victim Reconciliation Program, and ROP residential treatment, yet still failed to improve. The juvenile court concluded that Z.T. had failed to make significant progress at ROP. Therefore, the juvenile court ordered that he be committed to the DOC. Z.T. now appeals.

# Discussion and Decision

[8] Z.T. raises two arguments on appeal: the juvenile court erred by denying him due process during his modification of disposition hearing and by improperly placing him in the DOC.

# I. Due Process

[9] First, Z.T. argues that the juvenile court denied him due process during his modification of disposition hearing. We note from the outset that Z.T. failed to make any contemporaneous objection during the hearing. *N.W.W. v. State*, 878

---

[2] Skype is a commonly used form of audio/visual telecommunications where the users can speak to each other, face-to-face, through a computer screen.

N.E.2d 506, 509 (Ind. Ct. App. 2007) (holding that a proper objection is required to preserve an error for appeal). However, absent this contemporaneous objection, we will still review errors if they satisfy an extremely narrow fundamental error exception. *D.M. v. State*, 108 N.E.3d 393, 394 (Ind. Ct. App 2018). To qualify as a fundamental error, it must be so prejudicial to the rights of the party that fair proceedings are impossible. *Id.* Additionally, the error must constitute a blatant violation of basic principles, the harm or potential for harm must be substantial, and the resulting error must deprive the party of fundamental due process. *S.D. v. State*, 937 N.E.2d 425, 429 (Ind. Ct. App. 2010).

[10] Specifically, Z.T. claims that he was denied due process because, pursuant to Indiana Administrative Rule 14, he did not waive his right to be physically present by consenting to have the proceeding conducted via Skype. That rule states, in pertinent part,[3] as follows:

> (B) In addition, in any conference, hearing or procedure not specifically enumerated in Section (A) of this rule . . . a trial court may use telephone or audiovisual communications subject to:
>
> > (1) the written consent of all the parties, . . .

---

[3] Rule 14(A) lists specific hearings and what is required in each before a trial court may use audio/visual technology. This subsection is not germane to this discussion because Z.T.'s modification of disposition hearing does not fall within the definition of any proceeding listed in that section. Most of the Rule 14(A)(2) proceedings are criminal in nature and deal with sentencing, review, and post-conviction relief.

[11]     Our Supreme Court held in *Hawkins v. State*, 982 N.E.2d 997 (Ind. 2013), that Skype fit within the definition of "audiovisual communication" under Administrative Rule 14. The Court reiterated that presence via Skype equipment was not the same as being "personally present" at trial and that the Rule still required a *criminal defendant* to explicitly waive the right to be personally present through written consent. *Id*. at 1002-03. Z.T. relies heavily on this case to demonstrate that like the defendant in *Hawkins*, Z.T. did not consent to appear at the hearing via Skype.

[12]     Z.T.'s argument is unavailing for several reasons. First, unlike the defendant in *Hawkins*, who was in the midst of a criminal trial, Z.T. was in the midst of a modification for disposition hearing. Juvenile courts have wider discretion not only in how they conduct their hearings but also in how they appropriately deal with the minors involved. *Jordan v. State*, 512 N.E.2d 407, 408-09 (Ind. 1987). Simply put, we treat criminal defendants and delinquent minors differently, and we afford greater procedural protections for the former than we do for the latter.

[13]     To this point, one of our cases is dispositive of this issue. Earlier this year, we decided *C.S., Jr. v. State*, Cause No. 18A-JV-862 (Ind. Ct. App. Sept. 19, 2018), which is strikingly similar to the case at hand. In *C.S.*, we concluded that "rules relating to the sentencing of criminal offenders [including those which Z.T. claims should apply to his case] do not apply. Rather, we look to the statutes relating to juvenile delinquency proceedings." Slip op. at 3.

[14] Indiana Code section 31-37-18-1.3 outlines the procedural requirements for a juvenile dispositional hearing. Like with most juvenile hearings, all that is required is for the juvenile court to provide the delinquent minor with notice and an opportunity to be heard. *Id.* There is no requirement for the minor to be physically present at the hearing, nor is there a requirement that he waive this right before the court uses audio/visual equipment like Skype.

[15] The minor in *C.S.* was only "present" at a dispositional hearing via video conference, and we held that this satisfied section 31-37-18-1.3. Moreover, the minor had proper notice and had an opportunity to be heard at the hearing, just as Z.T. did. We find that Administrative Rule 14(B) applies only to sentencing, post-conviction, and other criminal proceedings where the risk of due process violations is much higher. Thus, the juvenile court was not bound by the strictures of Administrative Rule 14 in how it chose to conduct its hearing. Rather, we afford juvenile courts greater leniency, and in this case, the discretion exercised by the juvenile court in using Skype did not violate section 31-37-18-1.3.

[16] Z.T. would have us apply strict protections and rules ordinarily afforded to criminal defendants, which we may not do in a juvenile delinquency setting. Therefore, the juvenile court did not deny Z.T. due process.

## II. Commitment to DOC

[17] Next, Z.T. argues that the juvenile court improperly placed him in the DOC.

We will reverse a juvenile court's placement of a delinquent minor only if the decision is clearly against the logic and effect of the facts and circumstances before it. *C.C. v. State*, 831 N.E.2d 215, 216-17 (Ind. Ct. App. 2005). The choice of a disposition for a juvenile is within the sound discretion of the juvenile court, and it is accorded wide flexibility in making that judgment. *E.L. v. State*, 783 N.E.2d 360, 366 (Ind. Ct. App. 2003).

[18]  Indiana Code section 31-37-18-6(1)(A) states that a juvenile court shall enter a dispositional decree that is "in the least restrictive (most family like) and most appropriate setting available; and . . . [is] consistent with the best interest and special needs of the child." Z.T. argues that the DOC was not the most appropriate setting available and his placement therein was not consistent with his best interest and special needs.

[19]  While the goal of child placement within the juvenile court system is rehabilitation and not punishment, *R.H. v. State*, 937 N.E.2d 386, 388 (Ind. Ct. App. 2010), the decision to place Z.T. in the DOC was still appropriate. Z.T. was diagnosed with Depressive Disorder and Oppositional Defiant Disorder, and at Z.T.'s initial disposition disorder, the juvenile court placed Z.T. in the ROP program. All parties agreed that such a military-like institution would be the best treatment option for Z.T. because of his severe mental health issues.

[20]  Nevertheless, even when presented with multiple opportunities to rehabilitate himself over the course of six months, Z.T. showed few signs of progress at ROP. Z.T. constantly harassed, berated, and even physically harmed his fellow

residents and ROP staff members. He destroyed property, resisted any sort of commands from authority figures, skipped therapy sessions, and disrupted other residents' treatment programs. Z.T. is still dealing with numerous mental health issues, and though he had a long-term opportunity to receive treatment, he did not engage.

[21] Z.T. disagrees, arguing that placing him in the DOC was not the least restrictive alternative option for his treatment. In the past, we have held that a delinquent juvenile's placement "with the DOC may still be appropriate even if less restrictive alternatives are available." *D.P. v. State*, 783 N.E.2d 767, 771 (Ind. Ct. App. 2003); *see also J.B. v. State*, 849 N.E.2d 714, 718-19 (Ind. Ct. App. 2006) (holding that juvenile's placement in DOC was warranted after violating probation, committing new offenses, and failing to take advantage of prior opportunities for treatment). Given Z.T.'s particularly violent behavior and clear lack of respect for authority, placement in the DOC is an appropriate second option, especially since all parties concede that a highly structured and heavily monitored environment is what Z.T. needs to heal. Also, ROP does not want to keep Z.T., so returning to that facility is no longer a viable option for him. Consistent with Z.T.'s best interests and the safety of the surrounding community, it was not erroneous for the juvenile court to modify Z.T.'s disposition by placing him in the DOC.

[22] The judgment of the juvenile court is affirmed

May, J., and Tavitas, J., concur.